UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
DIANNE FERNSMITH,                      :

                                       :

                 Plaintiff,        :

                                       :            __OPINION AND ORDER__

        -against-             :            **15-CV-05036 (DLI)**

                                       :

COMMISSIONER OF SOCIAL SECURITY,    :

                                       :

                Defendant.     :
-------------------------------------------------------------------x
**DORA L. IRIZARRY, Chief United States District Judge:**

       On May 3, 2011, Plaintiff Dianne Fernsmith ("Plaintiff") filed an application for Social

Security disability insurance benefits ("DIB") under Title II of the Social Security Act ("the

Act"), 42 U.S.C. § 401 *et seq*, alleging that she was disabled since February 1, 2011. *See*

Certified Administrative Record ("R."), Dkt. Entry No. 7 at 149-150. On September 23, 2011,

the Social Security Administration ("SSA") denied Plaintiff's application for DIB, and Plaintiff

timely requested a hearing. *Id.* at 83-89. On October 11, 2012, Plaintiff appeared, with counsel,

and testified at a hearing before Administrative Law Judge Hilton R. Miller (the "ALJ"). *Id.* at

58-75. In a decision dated November 21, 2012, the ALJ concluded that Plaintiff was not

disabled within the meaning of the Act. *Id.* at 46-51. On October 22, 2013, the ALJ's decision

became the Commissioner's final decision when the Appeals Council denied Plaintiff's request

for review. *Id.* at 3-5.

       On December 16, 2014, Plaintiff requested additional time to file a civil action, which

was granted by the SSA. *Id.* at 1-2. Plaintiff filed the instant appeal seeking judicial review of

the denial of benefits pursuant to 42 U.S.C. § 405(g). *See* Complaint ("Compl."), Dkt. Entry No.

1. After the Commissioner filed her answer, Plaintiff moved for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure seeking reversal of the denial of

benefits. *See* Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem."), Dkt. Entry No. 10. The Commissioner cross-moved for judgment on the pleadings seeking affirmation of the denial of benefits. *See* Mem. in Supp. of Def.'s Cross Mot. for J. on the Pleadings ("Def. Mem."), Dkt. Entry No. 13. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is granted, and the Commissioner's motion for judgment on the pleadings is denied. This action is remanded to the Commissioner for additional proceedings consistent with this opinion.

## **BACKGROUND**[1]

### A.    **Non-Medical Evidence and Self-Reported Evidence**

Plaintiff was born on February 22, 1953.[2] R. at 61. She attended school through the tenth grade. *Id.*[3] Plaintiff previously worked as a secretary at a limousine company between 1996 and 2008, where she entered billing information into a computer, filed orders, and assisted drivers with vouchers. *See Id.* at 182-183, 208. The job required walking for a total of two hours per day, standing for one and a half hours per day, sitting for around five hours per day, and climbing stairs, writing, typing, handling small objects, and frequently lifting less than ten pounds. *Id.* at 183. Plaintiff stopped working at the limousine company in 2008 when she was laid off. *Id.* at 69.

On August 18, 2011, Plaintiff completed a "function report" in which she stated that her daily activities included cooking, going for walks, going to the store, and straightening up the

---

[1] Having thoroughly and carefully reviewed the administrative record, the Court finds that the Commissioner's factual background accurately represents the relevant portions of said record. Accordingly, the following background is taken substantially from the background section of the Commissioner's brief.

[2] Plaintiff was 57 years old on February 1, 2011, the date she allegedly became disabled. Therefore, Plaintiff was a "person of advanced age" according to 20 C.F.R. § 404.1563(e).

[3] At the hearing, Plaintiff testified that she had completed the tenth grade. However, in her disability report, she stated that the highest level of education she completed was the twelfth grade. *Id.* at 163.

house.  *Id.* at 170.  Plaintiff also noted that, due to her conditions, she walked less and was unable to climb as many stairs as she did previously because she coughed and lost her breath.  *Id.* Plaintiff's conditions affected her sleep because sometimes she would wake up coughing.  *Id.* However, Plaintiff could cook daily, clean, wash laundry and dishes without help, go outside daily, go to church often, walk, ride in cars, shop for food, and use public transportation.  *Id.* at 170-174, 179.  Plaintiff read, watched television, and sometimes played games on the computer. *Id.* at 173.

Additionally, Plaintiff noted that her conditions caused her to complete tasks slower and made it more difficult for her to walk.  *Id.* at 174.  She was unable to lift heavy objects, stand for long periods of time, kneel, squat, and reach.  *Id.* at 174-75.  While she was able to walk and climb stairs, these activities sometimes caused her pain in her legs and knees.  *Id.* at 175. Plaintiff asserted that she could walk for one and a half blocks before having to rest for about five to ten minutes.  *Id.* at 176.  Plaintiff reported that she felt pain in the middle of her back, lower back, legs, knees, and sometimes in her hand and arm.  *Id.* at 175, 178.  Sometimes she felt pain every day, and it was either an ache or a sharp pain.  *Id.* at 178.  Walking and going up or down stairs caused the pain.  *Id.*  To ease the pain, Plaintiff took Ibuprofen or Advil twice a day. *Id.*  Aside from physical pain, Plaintiff stated that she experienced chronic obstructive pulmonary disease ("COPD") exacerbations, which included coughing and losing her breath five to six times per day.  *Id.* at 180.  The loss of breath and coughing resulted from going up and down stairs, hot and humid weather, walking, and cold weather.  *Id.*  To treat her COPD, Plaintiff took Advair, an Albuterol inhaler, and Albuterol Sulfate daily.  *Id.*

On October 11, 2012, Plaintiff testified before the ALJ that she lived with her sister-in-law and had stopped working in 2008 when she was laid off.  *Id.* at 68-69.  She stated that she

did not take public transportation, did not have a driver's license, and was unable to complete any household chores. *Id.* at 71. Plaintiff also testified that she was unable to lift ten pounds, walk more than a block without getting out of breath, sit for more than ten to fifteen minutes without feeling discomfort, and could not stand for more than about five minutes without having to then sit down. *Id.* at 64-65. Plaintiff noted that she had back pain and pain that went down her legs. *Id.* at 64. She stated that arthritis in her knees forced her to keep her legs elevated. *Id.* at 64. Additionally, Plaintiff testified that she had diabetes, high cholesterol, high blood pressure, stomach problems, and COPD. *Id.* at 61-62. She stated that she took Advair twice a day, an inhaler, a nebulizer, and sometimes Prednisone. *Id.* at 62-63. At times, Plaintiff was out of breath in the middle of the night, when she walked too much, or if the weather was too cloudy or too damp. *Id.* at 63. Finally, Plaintiff testified that, around 2012, her doctors informed her that she had suffered a mini-stroke. *Id.* at 60.

During Plaintiff's hearing, Mr. Steven Feinstein testified as a vocational expert ("VE"). *Id.* at 67. The VE characterized Plaintiff's past work as secretarial work with a specific vocational preparation ("SVP") of 5. *Id.* at 67. The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and past work experience, who could:

> lift and/or carry up to 20 pounds occasionally, 10 pounds frequently, stand and/or walk with normal breaks for a total of about six hours in an eight hour work day, sit with normal breaks for a total of about six hours in an eight hour work day, can occasionally climb ramps and stairs, occasionally climb ladders, ropes, and scaffolds, frequently kneel, crouch, and crawl, balance, and stoop, avoids concentrated exposure to fumes, dust, odors, gases, poor ventilation, temperature extremes, and other respiratory irritants, does not involve foot controls or foot pedals utilizing the bilateral lower extremities.

*Id.* at 72-73. The VE testified that Plaintiff could perform her past work, which was sedentary work. *Id.* at 73. The ALJ then added an additional restriction of alternating between standing once every thirty minutes for approximately five minutes and sitting and asked the VE to once

again consider Plaintiff's past work.  *Id.*  Again, the VE testified that such an individual could perform Plaintiff's past work and other jobs, including general office clerk.  *Id.* at 74.  In turn, Plaintiff's counsel asked the VE if the hypothetical individual could qualify for the general office clerk job if they could only sit or stand for up to two hours in an eight-hour day.  *Id.* at 75.  In this case, the VE stated that the position would be unavailable to that individual.  *Id.*

**B.**     **Relevant Medical Evidence**

Plaintiff visited Staten Island University Hospital ("SIUH") on May 4, 2011, for an initial physical evaluation by Dr. Wai-Kwok Tam.  R. at 229-230.  Plaintiff complained of back pain in the area of her tenth rib, which she rated at two out of ten, and reported a history of COPD.  *Id.* Plaintiff informed the doctor that she smoked one pack of cigarettes per day for the last thirty-five years, and the doctor advised her against smoking and recommended a trial of a nicotine gum.  *Id.*

On May 25, 2011, x-rays of Plaintiff's chest revealed a bony irregularity of the right tenth rib, which the doctor indicated might represent a nondisplaced fracture.  *Id.* at 322.  The x-rays showed that Plaintiff's lungs were clear without infiltrate, effusion, or consolidation.  *Id.* at 321. While it appeared like there was no active disease, it seemed like there was a pectus carinatum deformity of the chest wall.  *Id.*

On June 20, 2011, Plaintiff visited SIUH's emergency department complaining of constant right wrist pain; Plaintiff described the pain as "aching" and noted that it started after she used her computer.  *Id.* at 217-218.  X-rays of her right wrist revealed no acute fractures or dislocation.  *Id.* at 223.  Plaintiff had no motor or sensory deficits and her neurovascular examination was within normal limits.  *Id.* at 218.  She had tenderness in her right wrist and the doctor diagnosed a contusion of the right wrist.  *Id.* at 218, 220.  Her right wrist was placed in a

splint and she was discharged with instructions to follow up with her primary care physician. *Id.* at 218, 220-221.

On July 7, 2011, Plaintiff returned to SIUH and saw Dr. Wai-Kwok Tam, stating that the pain in her wrist was the same. *Id.* at 232. Dr. Wai-Kwok Tam found that Plaintiff's wrists were the same size and there was no swelling. *Id.* Dr. Tam's impression was possible carpal tunnel syndrome. *Id.* On July 13, 2011, Plaintiff underwent a bone densitometry, which revealed that her bone density is classified as osteoporosis and is significantly decreased. *Id.* at 324. This meant that Plaintiff has an increased risk of fracture. *Id.* at 324. Nonetheless, the results were within normal range for women in her age group. *Id.*

On August 8, 2011, Plaintiff saw Dr. Vladimir Kozhinskiy at SIUH, where she reported her history of COPD and asked to see Dr. Louis Sasso, a pulmonologist. *Id.* at 258. During this visit, Plaintiff did not complain of shortness of breath or chest pain. *Id.* An examination of Plaintiff's lungs showed decreased air entry, but no rhonchi or wheezing. *Id.* at 259. Dr. Kozhinskiy advised Plaintiff to quit smoking and recommended that she see a pulmonologist. *Id.* Dr. Kozhinskiy also assessed type II diabetes, COPD, osteoporosis, and elevated blood pressure. *Id.* The doctor recommended that Plaintiff start taking medication for her diabetes, hypertension, and osteoporosis. *Id.*

On August 19, 2011, Plaintiff underwent pulmonary function testing (spirometry), which revealed a small airways obstructive defect. *Id.* at 329-330. The report noted that lung volumes and diffusion capacity were within normal limits and forced expiratory flow (FEF 25-75) changed by nine percent, which was interpreted as an insignificant response to the bronchodilator. *Id.* at 330.

On August 26, 2011, Plaintiff saw Dr. Sasso, a pulmonologist, at SIUH. *Id.* at 260-261. Plaintiff stated that she smoked a pack of cigarettes a day and had dyspnea (shortness of breath) on exertion. *Id.* at 260-261. She was experiencing no chest pain, hemoptysis (coughing blood), or purulent sputum. *Id.* at 260. Dr. Sasso's examination revealed hyperresonance of the chest, decreased breath sounds, and normal heart sounds. *Id.* The doctor assessed Plaintiff's COPD and prescribed Advair and Albuterol. *Id.* at 261. He ordered a CT-scan of Plaintiff's chest and advised her to participate in a smoke cessation clinic. *Id.*

On September 1, 2011, a CT-scan of Plaintiff's chest revealed pulmonary nodules ranging from three to five millimeters, no acute infiltrates, no evidence of left hilar mass, and probable left adrenal gland adenoma. *Id.* at 307-308.

On September 15, 2011, Plaintiff travelled by bus to an appointment with Dr. Mahendra Misra for a consultative exam. *Id.* at 238-239. Plaintiff's "chief complaint" was pain in the lower back, which began gradually over the past few years and increased with activity. *Id.* at 238. During the examination, Plaintiff stated that she smoked half of a pack of cigarettes a day, slept "more or less" normally, and did all the household chores. *Id.* at 239. Plaintiff reported that she could stand for fifteen minutes continuously, walk about two blocks, sit for thirty minutes to one hour, depending on the level of pain, and lift about five pounds. *Id.* Dr. Misra observed that Plaintiff walked with a "more or less normal heel to toe gait," could heel/toe walk, and could squat 2/3 of the way down. *Id.* at 240. The doctor reported that Plaintiff's posture was erect and she had no difficulty getting on and off the examination table. *Id.* Plaintiff had full range of motion in her cervical and thoracic/lumbar spine and all of her other joints were also within normal range. *Id.* at 240, 242-43. Plaintiff was able to perform straight leg raising to

ninety degrees bilaterally. *Id.* at 240. Dr. Misra found no evidence of muscle atrophy or muscle spasm. *Id.* Plaintiff had a 4 over 5 grip strength and good finger dexterity. *Id.* at 239.

Plaintiff's neurological examination revealed no evidence of motor or sensory deficit. *Id.* at 240. Dr. Misra concluded that although Plaintiff complained of some low backache the musculoskeletal system "appeared to be quite intact." *Id.* However, Dr. Misra stated that Plaintiff's main problem was COPD (or pulmonary incompetence), with a minor degree of lumbosacral spondylolysis. *Id.* The doctor specified that Plaintiff might not be able to do "very active jobs" because of her pulmonary condition. *Id.*

In September and November 2011, Plaintiff followed up with Dr. Sasso. *Id.* at 262-263, 266-267. On November 25, 2011, Plaintiff complained of a cough, which she had for several weeks. *Id.* at 266. At that time, she was on an antibiotic, Augmentin, which she believed helped her symptoms. *Id.* During this visit, Plaintiff was wheezing. *Id.* at 266. Dr. Sasso assessed worsening COPD versus sinusitis versus bronchitis. *Id.* Dr. Sasso again advised Plaintiff to participate in a smoke ending clinic and treated her with a tapering course of Prednisone *Id.* at 267. Additionally, he advised her to continue on her other medications for COPD. *Id.* Finally, Dr. Sasso also ordered an echocardiogram. *Id.* at 263, 266.

On December 1, 2011, an echocardiogram was conducted to assess left ventricular function. *Id.* at 309-11. The echocardiogram showed that systolic function of the left ventricle was normal and ejection fraction was in the range of 55% to 65%. *Id.* at 309. The echocardiogram showed no regional wall motion abnormality, although the possibility was not completely excluded on the basis of the study. *Id.* Plaintiff's ventricular septum showed dyssynergic motion. *Id.*

On December 9, 2011, Plaintiff saw Dr. Kozhinskiy and reported that her shortness of breath was better and rated her back pain at five out of ten. *Id.* at 268. Dr. Kozhinskiy found that Plaintiff's lungs were clear to auscultation and her COPD was stable with her medications. *Id.* Plaintiff was smoking about ten cigarettes a day and the doctor urged her to quit smoking. *Id.* at 268-69. On March 1, 2012, Plaintiff followed up with Dr. Kozhinskiy and complained of stomach pain, a cough, and right knee pain. *Id.* at 271. The doctor reported that her lungs were clear and that her abdomen was soft. *Id.* Dr. Kozhinskiy recommended that Plaintiff get x-rays of her low back and right knee, and also advised her that she should participate in a smoking cessation program. *Id.* at 272.

On March 2, 2012, Plaintiff underwent a blood test that showed that her glucose level was 118 on a reference range of 70 to 110. *Id.* at 255. On the same day, Plaintiff followed up with Dr. Sasso and complained that she had a persistent cough with yellow phlegm. *Id.* at 274. She reported that she used Advair twice a day, Albuterol once a day, and a nebulizer around two to three times a week when her shortness of breath was bad. *Id.* Dr. Sasso advised Plaintiff to continue her current medications, quit smoking through a smoke ending clinic, and to have a CT-scan of her chest. *Id.* at 275.

Dr. Kozhinskiy ordered x-rays of Plaintiff's lumber spine, which were taken on March 8, 2012, and showed no acute fracture or spondylolisthesis. *Id.* at 256, 299, 335, 344-345. However, there was mild endplate spondylosis at the level of L1-2, minimal disc space narrowing at L4-L5, and mild facet arthrosis at L4-L5. *Id.* at 335. The x-rays also revealed mild right hip degenerative changes. *Id.* The x-rays of Plaintiff's right knee, which were ordered by Dr. Kozhinskiy and taken that same day, revealed patellar tendinitis but no acute fracture. *Id.* at 256. The x-ray revealed medial joint line inflammation with mild degenerative change. *Id.*

On March 12, 2012, Plaintiff returned to Dr. Kozhinskiy complaining of pain in her left groin area. *Id.* at 276. The doctor advised Plaintiff to see a surgeon to rule out a hernia. *Id.* He advised Plaintiff again to quit smoking and recommended that she start taking Metformin for her diabetes. *Id.* at 277.

A follow-up CT scan of Plaintiff's chest on March 16, 2012, revealed that her pulmonary nodules were unchanged from the previous study performed six months earlier. *Id.* at 301, 306, 317-18. On March 26, 2012, a CT scan of Plaintiff's abdomen, which included her diaphragm, revealed lung nodules which were described on Plaintiff's prior chest CT scan on March 16, 2012. *Id.* at 304.

On May 16, 2012, Plaintiff saw Dr. Vincent Ruggiero, an orthopedist doctor at SIUH. *Id.* at 285. She complained of pain in both of her knees, which had progressively worsened over the previous months. *Id.* Plaintiff stated that Ibuprofen helped. *Id.* The examination revealed a good range of motion, and Dr. Ruggiero recommended physical therapy, ice, and non-steroidal anti-inflammatory medication. *Id.* at 285

Further X-rays of Plaintiff's lumbar spine taken on May 29, 2012, revealed chronic changes including mild endplate spondylosis at L1-L2, minimal disk space narrowing at L4-L5 and asymmetric right greater than left facet arthrosis L4-L5, and a tiny spur at L4. *Id.* at 354. The x-ray also revealed no fracture, dislocation, or destructive lesion. *Id.*

Plaintiff returned to Dr. Kozhinskiy on June 11, 2012, complaining of back pain, which started approximately two weeks prior to her visit when she bent down to pick up something from the floor. *Id.* at 287. Plaintiff reported to the doctor that recent x-rays in the emergency department were negative. *Id.* Plaintiff assessed her pain a nine out of ten, and an examination revealed peripheral tenderness in the lumbar area. *Id.* Dr. Kozhinskiy's assessed a possible back

sprain and recommended Ibuprofen and prescribed a muscle relaxant. *Id.* at 287-288. On July 11, 2012, Plaintiff followed up with Dr. Kozhinskiy for her back pain and requested a disability form. *Id.* at 290. During this visit, Plaintiff assessed her pain at seven out of ten. *Id.* The doctor noted that Plaintiff's COPD was stable and that Plaintiff was taking Ibuprofen and participating in physical therapy for her back pain, which was also stable. *Id.*

Plaintiff received physical therapy from June 2012 to September 2012 to treat her knee and lower back pain. *Id.* at 368-381. During her initial visit on June 27, 2012, Plaintiff rated her pain at six out of ten. *Id.* at 380. She completed a questionnaire and reported that she had "no difficulty" doing usual housework, usual hobbies or recreational activities, putting on her shoes or socks, performing light activities around her home, sitting for one hour, running on even or uneven ground, and hopping around. *Id.* at 368. Plaintiff indicated that she had "moderate difficulty" squatting and lifting an object, such as a bag of groceries, from the floor. *Id.* She reported "quite a bit of difficulty" getting in and out of the bath, performing heavy activities around the house, walking two blocks or a mile, and going up and down the stairs. *Id.* Plaintiff also stated that she experienced "extreme difficulty" standing for one hour. *Id.*

In July 2012, Plaintiff stated that she felt better on some days, and by August 2012, she reported that she was starting to feel better and rated her pain at around a three to four out of ten. *Id.* at 370, 371, 374. At Plaintiff's August 2, 2012 session, the physical therapist noted that range of motion in her legs was within normal limits and her sensation was intact. *Id.* at 371. The therapist also noted that Plaintiff's range of motion in her lumbar spine was within functional limits and her straight leg raising was negative. *Id.* at 371-372. The physical therapist assessed that Plaintiff showed improvements including decreased pain and increased strength. *Id.* at 372.

In August 2012, Plaintiff filled out another questionnaire in which she reported that she had "no difficulty" walking between rooms, putting on shoes or socks, getting into and out of a car, sitting for an hour, and rolling over in bed. *Id.* at 373. She noted that she had "a little bit of difficulty" performing housework, getting in and out of the bath, lifting an object like a bag of groceries, and going up or down the stairs. *Id.* She stated that she had "moderate difficulty" performing light activities around the house. *Id.* Plaintiff also reported having "extreme difficulty" or inability to perform other activities, such as her usual hobbies, squatting, heavy activities around the home, walking two blocks to a mile, standing for one hour, running, and hopping. *Id.* By August 20, 2012, Plaintiff stated that she had fallen again, but that she felt "much better." *Id.* at 375.

On August 14, 2013, Plaintiff went to the neurology department of SIUH complaining of lower back pain, which she described as "something there." *Id.* at 351. Plaintiff stated that her pain improved with time and physical therapy. *Id.* She reported that she recently slipped down the stairs and hit her buttocks, which caused new pain to her lower back and hips. *Id.* Plaintiff also reported additional falls. *Id.* On examination, Plaintiff experienced tenderness to palpitation of her lower back. *Id.* However, sensation was intact and reflexes were symmetric. *Id.* at 352. Examination of her lungs revealed decreased breath sounds. *Id.* at 351. Plaintiff was advised to continue physical therapy. *Id.* at 352.

On August 15, 2012, Plaintiff had x-rays of her lumbar spine due to degenerative arthritis, which revealed stable chronic changes and no fracture, dislocation, or destructive lesion. *Id.* at 353. On August 31, 2012, Plaintiff saw Dr. Kozhinskiy and rated her pain at a zero out of ten. *Id.* at 394. She also reported that she had quit smoking two weeks earlier. *Id.* at 395. She was experiencing an unsteady gait and balance problems, which was likely musculoskeletal

(knee etiology). *Id.* at 394. Dr. Kozhinskiy diagnosed Plaintiff with chronic lower back pain, COPD, while noting her long history of smoking, unsteady gait, multiple lung nodules, uncontrolled type II diabetes, and high cholesterol. *Id.* at 350, 394-395.

On September 6, 2012, Plaintiff had a CT scan of her head due to her unsteady gait. *Id.* at 355-56. There was no evidence of acute intracranial hemorrhage. *Id.* There were nonspecific foci of the white matter diminished attenuation and findings comparable with ischemic change in the left thalamus. *Id.* On September 11, 2012, Plaintiff saw a neurologist at SIUH for a follow-up visit after her CT scan. *Id.* at 397. Romberg sign showed that she leaned slightly to the left. *Id.* at 398. Plaintiff walked with a normal gait and the neurological examination was otherwise normal, including normal reflexes, sensation, and coordination. *Id.* at 398.

A follow-up CT scan of Plaintiff's chest on September 6, 2012, showed no new pulmonary nodules and that the nodules were "overall stable" as compared to the prior CT scans. *Id.* at 357-58. The CT scan also showed mild emphysematous changes and a stable right adrenal gland adenoma. *Id.* at 358.

On September 13, 2012, x-rays of Plaintiff's chest showed no cardiopulmonary disease. *Id.* at 390. On the same day, carotid duplex imaging revealed 20% to 39% stenosis of both the right and left internal carotid arteries. *Id.* at 389. On September 17, 2012, a spirometry revealed a minimal obstructive lung defect. *Id.* at 393. Plaintiff's lung volumes were within normal limits and there was a moderate decrease in diffusing capacity. *Id.* The interpretation suggested poor test performance. *Id.* Forced expiratory flow (FEF 25-75) changed by thirteen percent after a bronchodilator, which indicated an insignificant response to the bronchodilator. *Id.*

## DISCUSSION

### A. Standard of Review

Unsuccessful claimants for disability benefits have the option to bring an appeal in federal district court "within sixty days after the mailing…of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009)). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (internal citations omitted). The latter determination requires the court to ask whether the decision is supported by more than a mere scintilla of relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp.2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the

essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999) (quotations omitted).

**B.      Disability Claims**

To receive disability benefits, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d).  Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A).  The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, as well as any other evidence the Commissioner may require.  42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520.  If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there.  At the first step, the claimant is not disabled if he or she is working and performing "substantial gainful activity."  20 C.F.R. § 404.1520(b).  Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education and work experience.  Impairments are "severe" when they significantly limit a claimant's physical or mental ability to conduct basic work activities.  20 C.F.R. § 404.1520(c).  Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("the Listings").  *See* 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the

claimant's residual functional capacity ("RFC") in steps four and five.  20 C.F.R. § 404.1520(e).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [her]

limitations."  20 C.F.R. § 404.1545(a)(1).  At the fourth step, the claimant is not disabled if he or

she is able to perform past relevant work.  20 C.F.R. § 404.1520(f).  Finally, at the fifth step, the

ALJ determines whether the claimant could adjust to other work existing in the national

economy, considering factors such as age, education, and work experience.  If so, the claimant is

not disabled.  20 C.F.R. § 404.1520(g).  At this final step, the burden shifts to the Commissioner

to demonstrate that the claimant could perform other work.  *See Draegert v. Barnhart*, 311 F. 3d

468, 472 (2d Cir. 2002) (citing *Carroll,* 705 F. 2d at 642).

## C.    The ALJ's Decision

On November 21, 2012, the ALJ issued a decision denying Plaintiff's claim.  R. at 46-51.

First, the ALJ determined that Plaintiff met the insured status requirements of the Act through

December 31, 2013.  *Id.* at 48.  The ALJ then followed the five-step procedure in making his

determination that Plaintiff had the RFC to perform light work,[4] as defined in 20 C.F.R.

404.1567(b), with some additional restrictions.  *Id.* at 49.  As a result, the ALJ determined that

Plaintiff was not disabled.  *Id.*  At the first step, the ALJ found that Plaintiff has not engaged in

substantial gainful activity since February 1, 2011.  *Id.* at 48.  At the second step, the ALJ

concluded that Plaintiff had the following severe impairments: COPD, osteoporosis, diabetes,

and arthritis.  *Id.* at 48.  At the third step, the ALJ determined that Plaintiff's impairment or

---

[4] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. 20 C.F.R. § 404.1567(b)

combination of impairments did not meet or equal the severity of an impairment included in the Listings. *Id.*

At the fourth step, the ALJ concluded that Plaintiff could perform light work, as defined in 20 CFR § 404.1567(b), with the following additional restrictions:

> the ability to occasionally climb ramps or stairs; the ability to occasionally climb ladders, ropes, or scaffolds; the ability to frequently kneel, crouch, balance, stoop, and crawl; the need to avoid concentrated exposure to fumes, dust, odors, gases, poor ventilation, temperature extremes, and other respiratory irritants; the inability to operate foot pedals utilizing the bilateral lower extremities; and the need to alternate between sitting and standing every 30 minutes, with a five minute standing break after which the claimant could return to sitting.

*Id.* at 49. Also at the fourth step, relying on the testimony of the VE, the ALJ determined that Plaintiff was capable of performing her past secretarial work, which was sedentary work. *Id.* at 51. Since the ALJ determined that Plaintiff was able to perform her past relevant work, he did not reach the fifth and final step.

**D.      Analysis**

Plaintiff moves for judgment on the pleadings, contending that the ALJ incorrectly determined that Plaintiff had the RFC to perform light work and failed to evaluate properly Plaintiff's credibility. *See generally* Pl. Mem. The Commissioner cross-moves for judgment on the pleadings seeking affirmation of the denial of Plaintiff's claim asserting that the ALJ's RFC determination is supported by substantial evidence, the ALJ correctly evaluated Plaintiff's credibility, and the ALJ properly determined that Plaintiff could perform her past work. *See generally* Def. Mem.

**1.           Plaintiff's Credibility Assessment**

Plaintiff argues that the ALJ applied incorrect legal standards by failing to properly assess her credibility. *See* Pl. Mem. at 6. The Court agrees.

The Second Circuit recognizes that subjective allegations of pain may serve as a basis for establishing disability. *See Taylor v. Barnhart,* 83 F. App'x 347, 350 (2d Cir. 2003). However, the ALJ is afforded discretion to assess the credibility of a claimant and is not "required to credit [Plaintiff's] testimony about the severity of her pain and the functional limitations it caused." *Correale-Englehart v. Astrue,* 687 F. Supp.2d 396, 434 (S.D.N.Y. 2010) (quoting *Rivers v. Astrue,* 280 F. App'x 20, 22 (2d Cir. 2008)). To determine Plaintiff's credibility, the ALJ must adhere to a two-step inquiry set forth by the regulations. *See Peck v. Astrue,* 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010). First, the ALJ must consider whether there is a medically determinable impairment that reasonably could be expected to produce the pain or symptoms alleged. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (*per curiam*); 20 C.F.R. § 404.1529(b); SSR. 16-3p. Second, if the ALJ finds that the individual suffers from a medically determinable impairment that reasonably could be expected to produce the pain or symptoms alleged, then the ALJ is to evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which they limit the individual's ability to work. 20 C.F.R. § 404.1529(c).

When the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ is to evaluate the claimant's testimony in light of seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *Meadors v. Astrue*, 370 F. App'x 179, 183-84 (2d

Cir. 2010) (Summary Order).

"If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart*, 687 F. Supp.2d at 435. When the ALJ neglects to discuss at length her credibility determination with sufficient detail to permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether her decision is supported by substantial evidence, remand is appropriate. *Id.* at 435-36; *see also Jaeckel v. Colvin*, 2015 WL 5316335, at *9-11 (E.D.N.Y. Sept. 11, 2015) (remanding where "the ALJ failed to consider all the factors . . . and explain how he balanced those factors"); *Grosse v. Comm'r of Soc. Sec.,* 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding the ALJ committed legal error by failing to apply factors two through seven); *Valet v. Astrue*, 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (remanding the case where the ALJ "considered some, but not all of the mandatory" factors).

In this case, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effect of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." R. at 50. Aside from this statement, the ALJ did not make any other findings specific to Plaintiff's credibility. Here, the ALJ committed legal error. In a previous decision, this Court remanded an ALJ's decision based on this identical boilerplate statement because the "requirements of 20 C.F.R. § 404.1529(c)(4) provide that the ALJ must make a credibility assessment before making a RFC assessment, [since] the credibility assessment is used to determine Plaintiff's limitations

and RFC." *Faherty v. Astrue*, 2013 WL 1290953, at *16 (E.D.N.Y. Mar. 28, 2013). This principle is equally applicable here.

Other courts within this circuit have also rejected the use of this language because it "implies that ability to work is determined first and is then used to determine the claimant's credibility." *Arroyo v. Colvin*, 2016 WL 47871, at *11 (E.D.N.Y. Jan. 4, 2016) (internal citations omitted); *Jaeckel*, 2015 WL 5316335, at *10 (collecting cases); *Horn v. Comm'r of Soc. Sec.*, 2015 WL 4743933, at *29 (E.D.N.Y. Aug. 10, 2015); *Caternolo v. Astrue*, 2013 WL 1819264, at *11-12 (W.D.N.Y. Apr. 29, 2013). Although the use of such boilerplate language "does not require remand if the ALJ has otherwise explained [his] conclusion adequately," *Horn*, 2015 WL 4743933, at *30 (internal citations omitted), that is not the case here. Aside from this conclusory statement, it is unclear whether the ALJ considered evidence in the record to evaluate specifically Plaintiff's credibility. Instead, it appears that the ALJ simply used some evidence and part of Plaintiff's testimony to justify his RFC finding without first making a credibility determination. This was improper.

Notwithstanding the use of the boilerplate language, the ALJ also committed legal error by failing to consider properly and discuss with sufficient specificity how he balanced the necessary factors required by 20 C.F.R. § 404.1529(c)(3). *See Meadors*, 370 F. App'x at 185 n.2 (finding that the ALJ must consider each of the seven factors); *see also Jaeckel*, 2015 WL 5316335, at *10-11; *Patrick v. Colvin*, 2015 WL 1469270, at *16 (E.D.N.Y. Mar. 30, 2015); *but see Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (Summary Order). The ALJ concluded that Plaintiff's level of pain was not "as severe as alleged." R. at 50. Yet, the ALJ did not explicitly reference any of the seven listed factors, explain which relevant factors he specifically considered, or sufficiently clarify the reasoning behind his credibility determination.

*See Clark v. Colvin*, 2016 WL 1254024, at *10 n.5 (E.D.N.Y. Mar. 31, 2016) (internal citations omitted); *Emsak v. Colvin*, 2015 WL 4924904, at *16 (E.D.N.Y. Aug. 18, 2015); *Box v. Colvin*, 3 F. Supp.3d 27, 48 (E.D.N.Y. 2014). Instead, the ALJ simply summarized Plaintiff's testimony and some of the relevant medical evidence, made vague references to Plaintiff's daily activities, and contrasted only one of Plaintiff's daily activities with select evidence in the record. The ALJ committed legal error and made it impossible to glean the rationale behind his decision. *See Cichocki*, 534 F. App'x at 76.

On remand, the ALJ must determine Plaintiff's credibility "before, and independently from, the RFC determination" using the proper factors in the regulations. *See Faherty*, 2013 WL 1290953, at *16. The ALJ also must clearly explain his credibility determination. After assessing Plaintiff's credibility, the ALJ should proceed to determine Plaintiff's RFC.

In addition to arguing that the ALJ correctly analyzed Plaintiff's credibility, the Commissioner argues that the ALJ's "RFC determination is supported by substantial evidence and should therefore be affirmed." Def. Mem. at 19. However, it is improper to uphold a decision on the grounds that it is supported by substantial evidence where there is a "reasonable basis for doubt whether the ALJ applied the correct legal principles." *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *see also Horn*, 2015 WL 4743933, at *31. Thus, regardless of whether the RFC is supported by substantial evidence, remand is required because the ALJ did not properly evaluate Plaintiff's credibility. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal.").

## **CONCLUSION**

For the foregoing reasons, the Commissioner's cross-motion for judgment on the pleadings is denied, Plaintiff's motion for judgment on the pleadings is granted, the decision of the Commissioner is reversed, and this matter is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this opinion.

SO ORDERED.

Dated: Brooklyn, New York
        September 16, 2016

_____
        /s/
DORA L. IRIZARRY
Chief Judge
